No. 13-2389

IN THE
UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

ROBERT S. REYNOLDS,

*Plaintiff-Appellant*,

v.

DOUGLAS A. MIDDLETON,

*Defendant-Appellee.*

On Appeal from the United States District Court
for the Eastern District of Virginia (Gibney, J.)

BRIEF OF PLAINTIFF-APPELLANT
ROBERT S. REYNOLDS

William M. Jay
Brian T. Burgess*
GOODWIN PROCTER LLP
901 New York Avenue NW
Washington, DC 20001
Telephone: (202) 346-4000
Facsimile: (202) 346-4444
wjay@goodwinprocter.com
bburgess@goodwinprocter.com

Kevin P. Martin
GOODWIN PROCTER LLP
Exchange Place
Boston, MA 02109
Telephone: (617) 570-1000
Facsimile:  (617) 523-1231
kmartin@goodwinprocter.com

Dated: January 14, 2014

* Admitted to practice in New York only.  Working under the supervision of
District of Columbia admitted attorneys pending District of Columbia Bar
application.

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. __13-2389__    Caption: __Reynolds v. Middleton__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Robert S. Reynolds__
(name of party/amicus)

_____

who is _____appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐ YES ☑ NO

2.    Does party/amicus have any parent corporations?    ☐ YES ☑ NO
      If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐ YES ☑ NO
      If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?    ☐ YES ☑ NO
If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)    ☐ YES ☑ NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?    ☐ YES ☑ NO
If yes, identify any trustee and the members of any creditors' committee:

Signature: s/ William M. Jay                          Date: 01/14/2014

Counsel for: Robert S. Reynolds

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................... iii

STATEMENT OF JURISDICTION ........................................................ x

STATEMENT OF ISSUE PRESENTED FOR REVIEW ...................................... xi

STATEMENT OF CASE AND RELEVANT FACTS ................................... 1

II.    THE PLAINTIFF ENGAGES IN PROTECTED SPEECH FROM THE
       COUNTY'S TRAFFIC MEDIANS ............................................... 1

III.   HENRICO COUNTY CODE § 22–195 RESTRICTS A SUBSTANTIAL
       QUANTITY OF PROTECTED SPEECH ........................................ 2

   A.   Earlier Versions of the Ordinance ........................................... 2

   B.   The 2012 Amendment .......................................................... 3

IV.    PROCEDURAL HISTORY ......................................................... 7

   A.   Mr. Reynolds' First Amendment Claim ................................... 7

   B.   The District Court Opinion ................................................... 9

SUMMARY OF THE ARGUMENT .................................................... 11

ARGUMENT ............................................................................... 15

I.     STANDARD OF REVIEW AND THE BURDEN OF PROOF .................. 15

   A.   Standard of Review .............................................................. 15

   B.   Burden Of Proof And Level Of First Amendment Scrutiny ......... 16

      1.   The Government Must Justify A Speech Restriction .................... 16

      2.   The Ordinance Is Subject To Intermediate Scrutiny As A Restriction Of
           Speech Within Traditional Public Fora ................................... 18

i

II.   SECTION 22–195 IS NOT NARROWLY TAILORED BECAUSE IT
      BURDENS SUBSTANTIALLY MORE SPEECH THAN NECESSARY
      TO SERVE THE COUNTY'S INTEREST IN SAFETY .............................19

  A.   The Ordinance Restricts A Substantial Amount of Protected Speech ........19

  B.   Courts Have Repeatedly Invalidated Bans On Expression From Medians
       Absent Particularized Evidence Of Safety Problems......................................23

  C.   The County's Evidence Is Inadequate To Meet Its Burden............................28

    1.   Chief Middleton's Subjective Assessment Of Risk Is Inadequate To
         Support The Ordinance's Speech Restrictions ...................................28

    2.   The County Has Failed To Justify The Ordinance's County-Wide Scope.36

  D.   The Ordinance's Underinclusiveness Further Undermines the County's
       Asserted Safety Justification ................................................................39

  E.   The County Had Available Numerous Less Speech-Restrictive Alternatives
       To The Ordinance ................................................................................43

    1.   The County Could Achieve Its Safety Objectives By Enforcing Existing
         Laws Regulating Traffic Obstruction ................................................44

    2.   The County Failed To Even Consider Other Less Restrictive Alternatives
         To The Ordinance ................................................................................47

III.  SECTION 22–195 DOES NOT LEAVE OPEN ADEQUATE
      ALTERNATIVE CHANNELS FOR SPEECH .............................................49

CONCLUSION ................................................................................................53

REQUEST FOR ORAL ARGUMENT ................................................................55

ii

# TABLE OF AUTHORITIES

**CASES:**                                                                                          **Page**

*ACORN v. City of New Orleans*,
  606 F. Supp. 16 (E.D. La. 1984).............................................................23, 26, 27

*ACORN v. St. Louis Cnty.*,
  930 F.2d 591 (8th Cir. 1991) ...........................................................................23

*Am. Legion Post 7 of Durham, N.C. v. City of Durham*,
  239 F.3d 601 (4th Cir. 2001) ...........................................................................19

*Armour v. City of Indianapolis*,
  132 S. Ct. 2073 (2012)......................................................................................49

*Berger v. City of Seattle*,
  569 F.3d 1029 (9th Cir. 2009) .........................................................................40

*Board of Trustees of State University of New York v. Fox*,
  492 U.S. 469 (1989).........................................................................................35

*Brown v. Entm't Merchs. Ass'n*,
  131 S. Ct. 2729 (2011).....................................................................................40

*Casey v. City of Newport*,
  308 F.3d 106 (1st Cir. 2002)............................................................................44

*Central Hudson Gas & Electric Corp. v. Public Service Commission of New
  York*,
  447 U.S. 557 (1980).........................................................................................35

*City of Cincinnati v. Discovery Network, Inc.*,
  507 U.S. 410 (1993).........................................................................................40

*City of Houston v. Hill*,
  482 U.S. 451 (1987).........................................................................................35

*City of Ladue v. Gilleo*,
  512 U.S. 43 (1994)...........................................................................................50

*Clark v. Cmty. for Creative Non-Violence*,
468 U.S. 288 (1984)......................................................................19

*Clatterbuck v. City of Charlottesville*,
708 F.3d 549 (4th Cir. 2013) .........................................................1

*Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*,
657 F.3d 936 (9th Cir. 2011) (en banc) .....................................*passim*

*Dash v. Mayweather*,
731 F.3d 303 (4th Cir. 2013) ........................................................15

*Davenport v. City of Alexandria*,
710 F.2d 148 (4th Cir. 1983) ....................................................38, 39

*Denver Publ'g Co. v. City of Aurora*,
896 P.2d 306 (Colo. 1995)........................................................24, 27

*Desmond v. PNGI Charles Town Gaming, L.L.C.*,
630 F.3d 351 (4th Cir. 2011) .......................................................16

*Dominguez v. State*,
902 S.W.2d 5 (Tex. Ct. App. 1995)...........................................24, 51

*Edenfield v. Fane*,
507 U.S. 761 (1993)............................................................12, 16, 35

*Educ. Media Co. at Va. Tech, Inc. v. Insley*,
731 F.3d 291 (4th Cir. 2013) .......................................................17

*Frisby v. Shultz*,
487 U.S. 474 (1988)......................................................................38

*Giovani Carandola, Ltd. v. Bason*,
303 F.3d 507 (4th Cir. 2002) ...................................................*passim*

*Gooding v. Wilson*,
405 U.S. 518 (1972)......................................................................17

*Gresham v. Peterson*,
225 F.3d 899 (7th Cir. 2000) ...................................................27, 49

iv

*Hickory Fire Fighters Ass'n v. City of Hickory*,
656 F.2d 917 (4th Cir. 1981) ..............................................................39

*Hill v. Colorado*,
530 U.S. 703 (2000)............................................................................51

*Horina v. City of Granite City*,
538 F.3d 624 (7th Cir. 2008) ...............................................28, 36, 44

*Int'l Soc'y for Krishna Consciousness, Inc. v. City of Baton Rouge*,
876 F.2d 494 (5th Cir. 1989) ........................................................24, 27

*Joelner v. Vill. of Washington Park*,
508 F.3d 427 (7th Cir. 2007) ........................................................40, 41

*John Donnelly & Sons v. Campbell*,
639 F.2d 6 (1st Cir. 1980).................................................................30

*Krantz v. City of Fort Smith*,
160 F.3d 1214 (8th Cir. 1998) ..........................................................36

*Kuba v. 1-A Agric. Ass'n*,
387 F.3d 850 (9th Cir. 2004) .......................................................30, 36

*Legend Night Club v. Miller*,
637 F.3d 291 (4th Cir. 2011) ............................................................29

*Linmark Assocs. v. Twp. of Willingboro*,
431 U.S. 85 (1977).......................................................................14, 50

*Loper v. New York City Police Dep't*,
999 F.2d 699 (2d Cir. 1993) ...............................................................1

*Lytle v. Doyle*,
326 F.3d 463 (4th Cir. 2003) ......................................................45, 49

*Martin v. City of Struthers*,
319 U.S. 141 (1943)..........................................................................52

*Maryland v. Universal Elections, Inc.*,
729 F.3d 370 (4th Cir. 2013) ...........................................................43

v

*New Albany DVD, LLC v. City of New Albany*,
  581 F.3d 556 (7th Cir. 2009) ...............................................................33

*News & Sun-Sentinel Co. v. Cox*,
  702 F. Supp. 891 (S.D. Fla. 1988) .........................................23, 26, 41

*Nixon v. Shrink Mo. Gov't PAC*,
  528 U.S. 377 (2000).............................................................................16, 17

*Occupy Columbia v. Haley*,
  ___ F.3d ___, 2013 WL 6570949 (4th Cir. Dec. 16, 2013) ...............18

*Org. for a Better Austin v. Keefe*,
  402 U.S. 415 (1971).............................................................................16, 25

*People v. Barton*,
  861 N.E. 2d 75 (N.Y. 2006).................................................................27

*People v. Griswold*,
  821 N.Y.S.2d 394 (N.Y. City Ct. 2006) .............................................41

*Podberesky v. Kirwan*,
  38 F.3d 147 (4th Cir. 1994) .................................................................16

*Pueschel v. Peters*,
  577 F.3d 558 (4th Cir. 2009) ...............................................................15

*Saieg v. City of Dearborn*,
  641 F.3d 727 (6th Cir. 2011) ...............................................................40

*Schneider v. New Jersey*,
  308 U.S. 147 (1939)...........................................................................23, 47

*Smith v. City of Ford Lauderdale*,
  177 F.3d 954 (11th Cir. 1999) ..........................................................1, 27

*Smith v. Ozmint*,
  578 F.3d 246 (4th Cir. 2009) ...............................................................16

*Speet v. Schuette*,
  726 F.3d 867 (6th Cir. 2013) .................................................................1

*Sun-Sentinel Co. v. City of Hollywood*,
274 F. Supp. 2d 1323 (S.D. Fla. 2003) ........................................................24, 51

*Thayer v. City of Worcester*,
2013 WL 5780445 (D. Mass. Oct. 24, 2013) ....................................................24

*Thompson v. W. States Med. Ctr.*,
535 U.S. 357 (2002).........................................................................................49

*Traditionalist Am. Knights of Ku Klux Klan v. City of Desloge*,
914 F. Supp. 2d 1041 (E.D. Mo. 2012) ...............................................23, 25, 26

*Turner Broad. Sys., Inc. v. F.C.C.*,
512 U.S. 622 (1994).........................................................................................29

*United States v. Grace*,
461 U.S. 171 (1983).....................................................................................18, 22

*United States v. Playboy Entm't Grp., Inc.*,
529 U.S. 803 (2000).....................................................................................14, 16

*United States v. Stevens*,
559 U.S. 460 (2010).........................................................................................17

*Vill. of Schaumburg v. Citizens for a Better Env't*,
444 U.S. 620 (1980).....................................................................................46, 47

*Wag More Dogs, Ltd. Liab. Corp. v. Cozart*,
680 F.3d 359 (4th Cir. 2012) ......................................................................18, 19

*Ward v. Rock Against Racism*,
491 U.S. 781 (1989)....................................................................................*passim*

*Warren v. Fairfax County*,
196 F.3d 186 (4th Cir. 1999) (en banc) ......................................................*passim*

*Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Vill. of Stratton*,
536 U.S. 150 (2002).........................................................................................52

*Weinberg v. City of Chicago.*,
310 F.3d 1029 (7th Cir. 2002) .................................................................*passim*

*Whiteman v. Chesapeake Appalachia, L.L.C.*,
  729 F.3d 381 (4th Cir. 2013) .......................................................15, 16

*Wilkinson v. Utah*,
  860 F. Supp. 2d 1284 (D. Utah 2012)...........................................23, 26


## STATUTES:

28 U.S.C. § 1291 ...........................................................................x

28 U.S.C. § 1331 ...........................................................................x

28 U.S.C. § 1343 ...........................................................................x

42 U.S.C. § 1983 ...........................................................................7

Va. Code Ann. § 18.2-371.1 ..........................................................48

Va. Code Ann. § 46.2-100 .............................................................45

Va. Code Ann. § 46.2-923 .............................................................45

Va. Code Ann. § 46.2-926 .............................................................46

Va. Code Ann. § 46.2-930 .............................................................48

Henrico County Code § 5-29 ..........................................................48

Henrico County Code §13-22 .........................................................45

Henrico County Code § 22-181 (2008) .............................................3

Henrico County Code § 22-195 ................................................*passim*

Henrico County Ord. No. 549 (1980) ...............................................2


## RULES:

Fed. R. App. P. 34 ........................................................................54

Fed. R. Evid. 201 .........................................................................21

## <u>OTHER AUTHORITIES</u>:

Emily C. Dooley, *Chesterfield man the face of eSmartTax.com*, Richmond
    Times Dispatch, Jan. 21, 2010.............................................................................42

## **STATEMENT OF JURISDICTION**

The United States District Court for the Eastern District of Virginia had subject matter jurisdiction in *Reynolds v. Middleton*, Civil Action No. 3:12-cv-00779-JAG, pursuant to 28 U.S.C. §§ 1331 and 1343, as this action arises under the Constitution and laws of the United States.

On October 15, 2013, the District Court entered judgment in favor of Defendant-Appellant Douglas A. Middleton.    Plaintiff-Appellant Robert S. Reynolds filed a timely Notice of Appeal on November 13, 2013.  This Court has subject matter jurisdiction to review this final order pursuant to 28 U.S.C. § 1291.

## <u>STATEMENT OF ISSUE PRESENTED FOR REVIEW</u>

Whether Henrico County Ordinance § 22-195, which bans the distribution of handbills, the solicitation of contributions, and attempts to sell merchandise or services to motor vehicle occupants from all highways within Henrico County— defined to include the medians and shoulders of all roads and streets within the County—violates the First Amendment because it restricts speech within traditional public fora without satisfying any of the requirements applicable to time, place, and manner regulations.

## STATEMENT OF CASE AND RELEVANT FACTS

**I.    THE PLAINTIFF ENGAGES IN PROTECTED SPEECH FROM THE COUNTY'S TRAFFIC MEDIANS**

Plaintiff-Appellant Robert Reynolds is a resident of Henrico County ("the County").  JA 8.[1]  For approximately 10 years up until 2010, Mr. Reynolds was chronically homeless.  He  entered into a lease agreement for a room in the County in 2011.  *Id.*

Beginning in the summer of 2007 and up until the 2012 amendments to Henrico County Code § 22-195 that gave rise to this case, Mr. Reynolds would stand or sit on medians throughout Henrico County to solicit contributions from the occupants of motor vehicles.  JA 18.  Solicitation for charitable contributions consistently has been recognized as a form of speech protected under the First Amendment.  *See Clatterbuck v. City of Charlottesville*, 708 F.3d 549, 553 (4th Cir. 2013); *see also Speet v. Schuette*, 726 F.3d 867, 877-78 (6th Cir. 2013); *Smith v. City of Ford Lauderdale*, 177 F.3d 954, 956 (11th Cir. 1999); *Loper v. New York City Police Dep't*, 999 F.2d 699, 704 (2d Cir. 1993).

Mr. Reynolds depends on the charitable donations he solicits for his daily subsistence.  Mr. Reynolds paid his rent and purchased food and other necessities almost entirely from contributions he obtained while panhandling in median strips in Henrico County roadways.  JA 17-18.

---

[1] JA refers to the Joint Appendix.

1

## II.    HENRICO COUNTY CODE § 22–195 RESTRICTS A SUBSTANTIAL QUANTITY OF PROTECTED SPEECH

Since 1980, the County has been periodically tightening its restrictions on certain categories of protected speech, including solicitation, when such speech takes place in and around the County's roads.  As the scope of the County's restriction has continued to expand, the opportunities for individuals like Mr. Reynolds to engage in protected speech from within these traditional public fora have contracted accordingly.  The cumulative effect of the County's amendments, which are embodied in Henrico County Code § 22-195 ("Section 22-195" or "the Ordinance"), is to make it illegal to solicit contributions from vehicle occupants on any traffic median anywhere in the County, as well as to engage in other protected First Amendment activities from medians like providing handbills or attempting to sell goods or services to vehicle occupants.

### A.    <u>Earlier Versions of the Ordinance</u>

The County first adopted restrictions on the use of certain highways for expression in 1980, enacting an ordinance "to prohibit distribution of handbills, solicitation of contributions and sale of merchandise ["while standing"[2]] on County highways."  Henrico County Ord. No. 549 (1980).[3]  In 2008, the County extended

---

[2] Henrico County Ord. No. 549 § 1(A) (1980) (noting that the Ordinance applies to "any person while standing in the highway").

[3] In 1995, the Ordinance was amended in minor ways that are not material to this case.

the reach of this speech regulation by providing that the Ordinance would apply to "all highways located within the County," as well as by adopting an expansive definition of "highway" that encompassed, among other things, the median: "the entire width of a road or street that is improved, designed, or ordinarily used for vehicular travel and the shoulder, the median, and the area between the travel lane and back of the curb."  Henrico County Code § 22-181(b) (2008).

As a result of the 2008 amendment, the County's ordinance prohibited handbilling, solicitation, and the sale of or attempt to sell goods by anyone standing within any median in the County to the extent that his speech was directed to the audience of vehicle occupants.  Even so, because the law applied only "to any person . . . standing in the highway," it did at least leave Mr. Reynolds and other speakers with a limited opportunity, though far from an adequate one, to engage in protected speech from medians.  Consistent with the law, Mr. Reynolds and others continued to exercise their First Amendment rights by soliciting contributions while sitting, as opposed to standing, in medians.  JA 7.

### B.    The 2012 Amendment

In 2012, the Henrico County Police Department noted an increasing number of individuals soliciting contributions while sitting in medians, "especially in the medians of numerous intersections in the West End of the County."  JA 29. Douglas Middleton, Police Chief of Henrico County, was particularly concerned.

JA 45. Although he is "not a traffic safety specialist" and "do[es] not have any specific training in highway management or traffic safety," JA 103, Chief Middleton believed "the manner [of occupying intersections] which [the County was] beginning to observe" created an increased risk of accidents. JA 64. He relayed his opinions to the County Attorney's office, JA 97, 117, and proposed eliminating the word "standing" from the Ordinance so that its prohibitions would apply to all individuals in expansively defined "highways," including those who were sitting. JA 63.

Chief Middleton did not consult any expert in traffic or pedestrian safety before making his recommendation. JA 118. Rather, he based his proposal on his "opinion," informed by his "experience as a law-enforcement officer" and the unspecified and uncorroborated observations of other officers and of ordinary citizens, that engaging in panhandling and other expressive activities was unsafe in the areas covered by the Ordinance. JA 60. Adopting Chief Middleton's recommendations, the County Attorney's Office drafted amendments to the Ordinance that eliminated the word "standing," and that also added language extending the existing sales restriction to the sale, or attempt to sell, services. JA 63 (describing the two amendments); JA 98 (the County Attorney's Office "drafted the proposed legislation").

Chief Middleton subsequently presented the proposed amendments to the Henrico County Board of Supervisors during a public meeting on October 23, 2012.  JA 63.  Defending the amendments on public-safety grounds, Chief Middleton stated that "[i]n the past few years and particularly the current year, we have seen an increase in the number of individuals who are in the highway for one of the prohibited reasons, however, they are seated and not standing."  JA 63-64.[4] He indicated that this had led to "a significant increase in complaints from citizens," and added that the police department had "received reports of individuals sitting in the intersections with their pets, and in one instance a location where the individual was sitting with their child."  JA 64.

Without pointing to any concrete evidence, Chief Middleton claimed that "[t]he potential for an accident that results in property damage, injury, or potentially death is elevated when individuals occupy intersections in the manner which we are beginning to observe."  *Id.*  He acknowledged that there was "controversy over the changes to this ordinance," but stated that he could not "ignore the increasingly present danger" and instead wished "to avoid a tragedy" by "responding to" behavior in the highways "in a proactive manner as opposed to

---

[4]  A report prepared by the County Attorney's Office sought to quantify this increase.  It indicated that in 2011, 97 calls for service were made concerning panhandling, which led to four arrests.  In the eight months of 2012, 93 calls for service were made, which led to two arrests.  JA 31.

being reactive." *Id.* Chief Middleton accordingly urged the Board to adopt the amendments in the interest of public safety. JA 69-70.

Mr. Reynolds spoke in opposition to the amendments. JA 73. He argued that the resulting ordinance would violate his and other panhandlers' First Amendment right to seek contributions. JA 75-77.

The Board of Supervisors approved the proposed amendments. JA 90. The Ordinance, as amended, reads as follows:

**<u>Sec. 22-195</u> – Distributing handbills, soliciting contributions or selling merchandise or services in highway.**

> **(a)** It shall be unlawful for any person while in the highway to:
>
> > **(1)** Distribute handbills, leaflets, bulletins, literature, advertisements or similar material to the drivers of motor vehicles or passengers therein on highways located within the county.
> >
> > **(2)** Solicit contributions of any nature from the drivers of motor vehicles or passengers therein on highways located within the county.
> >
> > **(3)** Sell or attempt to sell merchandise or services to the drivers of motor vehicles or passengers therein on highways located within the county.
>
> **(b)** For purposes of this section, the term "highway" means the entire width of a road or street that is improved, designed, or ordinarily used for vehicular travel and the shoulder, the median, and the area between the travel lane and the back of the curb.

Henrico County Code § 22-195 (2012).

As amended, the Ordinance now categorically bars individuals from using public streets and medians to (1) distribute handbills and similar materials to motor vehicle occupants, whether for purposes of solicitation or some other purpose altogether, such as to promote a political campaign or political protest; (2) solicit contributions from vehicle occupants, whether for personal charity or on behalf of a charitable organization such as the Salvation Army; or (3) sell or attempt to sell any goods or services to motor vehicle occupants. It bans these expressive activities regardless of whether an individual walks out from the median and obstructs moving traffic, stands safely on the median and avoids entering the street, or even sits on a median passively displaying a sign that asks for charity or that advertises his availability for work. And it extends its prohibition to every single street and median within the County, from major downtown routes to quiet back roads.

## III.   PROCEDURAL HISTORY

### A.   <u>Mr. Reynolds' First Amendment Claim</u>

Mr. Reynolds, acting *pro se*, filed suit under 42 U.S.C. § 1983 against Chief Middleton in his official capacity. Mr. Reynolds sought a declaration that the Ordinance violates his constitutional rights, as well as an injunction against its enforcement. JA 6-15. Specifically, Mr. Reynolds alleged that the Ordinance violates the First Amendment, either because the Ordinance regulates speech on

the basis of its content or because the Ordinance unduly burdens his ability to solicit for charity in a public forum without providing adequate alternatives. JA 9-10. Mr. Reynolds explained that he feared that he would be arrested if he continued to exercise his First Amendment rights by soliciting contributions from medians. JA 10. Mr. Reynolds further alleged that the Ordinance violated his rights under the Due Process Clause, the Equal Protection Clause, and the Contracts Clause. JA 10-14.

After the District Court denied both the County's motion to dismiss and Mr. Reynolds' motion for a preliminary injunction and temporary restraining order, JA 37-39, the parties cross-moved for summary judgment. In his motion for summary judgment, Mr. Reynolds argued, among other things, that the Ordinance violated the First Amendment because it was passed on the basis of Chief Middleton's "personal opinion" that soliciting from medians was dangerous, and without any "in depth study into whether public safety is truly at risk by persons seeking contributions in the medians." JA 127. For its part, the County argued that the Ordinance was narrowly tailored to serve a substantial interest in the safety of its "highways," which it called "a narrowly defined term targeting the area reserved for vehicular travel and the medians." JA 52. To establish the existence of a public-safety problem, the County relied on Chief Middleton's personal

assessment of risk that had formed the basis of his recommendation to the Board of Supervisors.  JA 46-47.

### B.    The District Court Opinion

The District Court granted the County's motion for summary judgment, denied Reynolds' motion, and dismissed the case.  JA 183.

Beginning with Mr. Reynolds' First Amendment claim, the District Court recognized that by restricting expressive activities from the streets and roadside medians, the Ordinance regulated speech within traditional public fora.  JA 177. As such, the Court noted, "the government's power to regulate speech" was "limited, but not foreclosed."  *Id.*  The District Court explained that, under controlling precedent, the government may regulate the time, place, and manner of expression within a traditional public forum only if the regulation "(1) is content-neutral, (2) is narrowly tailored to serve a significant government interest, and (3) leaves open ample alternative channels of communication."  *Id.* (citing *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983)).

Applying this test, the District Court first concluded that the Ordinance is content-neutral, and accordingly is subject to intermediate rather than strict scrutiny.  JA 177-79.  The Court next determined that the Ordinance furthers a substantial government interest in public safety.  The District Court did not discuss any evidence of public-safety problems regarding the streets and medians in

Henrico County.  Rather, the Court relied only on case law recognizing that governments "have a legitimate interest in protecting their citizens and ensuring that their streets and sidewalks are safe for everyone."  JA 179 (quoting *Cox v. City of Charleston*, 250 F. Supp. 2d 582, 589 (D. S.C. 2003)).

Turning to the next prong of the test for time, place, and manner restrictions, the District Court concluded that the Ordinance was "narrowly tailored" to further the County's interest in public safety.  *Id.*  In support of that conclusion, the District Court observed that the Ordinance "only prohibits activities in the 'highway,'" which, echoing the County's submission, the Court described as "a narrow term including the area reserved for vehicular traffic and the medians" that did not extend to "non-roadway locations."   JA 179-80.  The District Court also stated that the Ordinance's restriction applied only to "activities that require an interaction between the pedestrian and the motorist or his passenger." JA 180.

Finally, the Court concluded that the Ordinance left open alternative channels of communication because "[t]he sidewalks and areas just past the shoulders remain fair game for begging, passing out handbills, or selling goods." *Id.*  In the Court's view, "[s]oliciting from the side of the road still provides [Mr.] Reynolds with his opportunity to win the attention of his listeners." *Id*.  In conclusion, the District Court held that "the Ordinance represents a constitutional regulation as a matter of law." *Id.*

10

The District Court further held that the County was entitled to summary judgment with respect to Mr. Reynolds' claims under the Due Process Clause, the Equal Protection Clause, and the Contracts Clause.  JA 180-82.[5]  Those claims are not at issue in this appeal.

## SUMMARY OF THE ARGUMENT

The District Court erred by granting summary judgment to the County, rejecting Mr. Reynolds' motion for summary judgment, and holding that the Ordinance is consistent with the First Amendment as a time, place, and manner regulation.  While the District Court accepted the County's characterization of the Ordinance as narrow, in fact the law—which applies to every public street and traffic median in the County—bans a needlessly large amount of protected expression.  Throughout the thousands of miles of public roads in Henrico County, it is now unlawful, for example, for individuals to sit or stand on a median with a sign saying "Will work for food," or for a charitable organization like the Salvation Army to solicit for contributions in stopped traffic near a traffic light, or for Boy Scouts to stand in a median advertising a nearby car wash, or for citizens to distribute handbills from the median located in front of the Henrico County Government Center.  The County bears a heavy burden, particularly on a motion

---

[5] The District Court also determined that a Ninth Amendment claim Mr. Reynolds raised during summary judgment proceedings was not properly before the Court. JA 174 n.2.

for summary judgment in which all genuinely disputed facts must be resolved in Mr. Reynolds' favor, in showing that the Ordinance's prohibition of speech within a public forum is consistent with the First Amendment. Numerous courts confronting similar laws that restricted expressive activities within traffic medians have struck them down, *infra* at 23-24, and the County has not satisfied its burden for three reasons.

First, the County has failed to show that the traffic safety problems it has identified are "real" or that the Ordinance "alleviate[s]" those problems "in a direct and material way." *Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 515 (4th Cir. 2002) (internal quotation marks & citation omitted). Rather than introduce studies, expert opinion, or accident reports, the County has justified the Ordinance almost exclusively on the basis of the safety predictions of a single police officer, Chief Middleton. Chief Middleton did not provide any objective evidence to support his opinion, but instead relied on a combination of intuition and hearsay, including a strange focus on reports of conduct—individuals bringing pets or children onto medians, JA 64—that has nothing whatever to do with the Ordinance's actual proscriptions. A police officer's unsupported predictions about safety, however genuinely felt, provide an inadequate basis for broadly restricting entire categories of speech within traditional public fora. *See Edenfield v. Fane*, 507 U.S. 761, 770 (1993) (recognizing that a government's First Amendment burden "is not satisfied

by mere speculation or conjecture" even under intermediate scrutiny). Moreover, while Chief Middleton suggested that the Ordinance was necessary to address driver distraction, not only did the County fail to introduce any objective evidence showing that any speaker on a median had caused an accident or a near miss, JA 113, it has also not explained how the Ordinance meaningfully furthers this interest by prohibiting an individual from sitting in a median with a "Will work for food sign" while allowing, for example, that same individual to stand in the median with an "Impeach Obama" sign.

Second, to the extent the County has established the existence of a public safety problem, the Ordinance is not a narrowly tailored solution because it "burden[s] substantially more speech than is necessary to further the government's legitimate interest[]" in traffic safety. *Ward v. Rock Against Racism*, 491 U.S. 781, 798-99 (1989). As numerous other courts have held, *infra* at 25-27, restrictions on speech that apply indiscriminately to all roadways and medians within a city, county, or state, are over-inclusive and thus fail narrow-tailoring review absent evidence that safety concerns are as widespread as the restriction. Here, the County's evidence, such as it is, suggests that the County's safety concerns were focused on speakers occupying the intersections of particularly busy streets, JA 101, but the Ordinance treats every street in the County as if it were a major expressway. The law's tailoring problem is highlighted by the "number of less

restrictive means of achieving its stated goals" that the County has available. *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 949 (9th Cir. 2011) (en banc). For example, the City could have addressed concerns about panhandlers and other speakers disrupting traffic flow by enforcing existing laws regulating the obstruction of traffic. *See infra* at 45-46.

Third, the Ordinance cannot survive First Amendment scrutiny because it does not leave ample alternatives for speakers like Mr. Reynolds to reach their target audience, *i.e.,* vehicle occupants. Proposed alternatives are inadequate when they "are less likely to reach persons not deliberately seeking" the protected speech and "may be less effective media for communicating the message" than the proscribed time, place, or manner of expression. *Linmark Assocs. v. Twp. of Willingboro*, 431 U.S. 85, 93 (1977). Here, the County has maintained that sidewalks and areas along the side of the road offer an alternative forum for panhandlers like Mr. Reynolds, but as Mr. Reynolds has explained, these places are inadequate because only medians allow solicitors to reach vehicle occupants with a message of charity in a timely and effective way. JA 9.

Because the County bears the burden of proving the Ordinance's constitutionality, *see United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 816 (2000), its failure to introduce evidence sufficient to satisfy First Amendment scrutiny entitles Mr. Reynolds to summary judgment. At a minimum, the District

Court erred by granting summary judgment to the County on the current record. To the extent the County may be able to show that the Ordinance is consistent with the First Amendment, it has not done so on the basis of uncontested facts, with all reasonable inferences from those facts construed in the light most favorable to Mr. Reynolds. *See Dash v. Mayweather*, 731 F.3d 303, 310 (4th Cir. 2013). For the County to establish that the Ordinance survives First Amendment scrutiny, it should at least be put to meeting its burden of proof at trial.

## ARGUMENT

### I. STANDARD OF REVIEW AND THE BURDEN OF PROOF

#### A. Standard of Review

The District Court's summary judgment decision is reviewed de novo, with this Court "applying the same standard as the trial court and without deference to the trial court." *Dash*, 731 F.3d at 310. In deciding whether summary judgment is proper, this Court "view[s] all facts and reasonable inferences therefrom in the light most favorable to the nonmoving party." *Pueschel v. Peters*, 577 F.3d 558, 563 (4th Cir. 2009) (quotation marks & citation omitted). Summary judgment is warranted only where based on "the totality of the evidence, including pleadings, depositions, answers to interrogatories, and affidavits, the court believes no genuine issue of material fact exists for trial and the moving party is entitled to judgment as a matter of law." *Whiteman v. Chesapeake Appalachia, L.L.C.*, 729

F.3d 381, 385 (4th Cir. 2013).   Where the government "bears the burden of proof"
on a claim or element of a claim, it is "only entitled to summary judgment if the
proffered evidence is such that a rational factfinder could only find for the
government." *Smith v. Ozmint*, 578 F.3d 246, 250 (4th Cir. 2009).

In a case like this one where both parties moved for summary judgment, "the
court examines each motion separately." *Desmond v. PNGI Charles Town
Gaming, L.L.C.*, 630 F.3d 351, 354 (4th Cir. 2011).   In undertaking that
examination, the court retains the responsibility to "ensure that there is no genuine
issue as to any material fact." *Podberesky v. Kirwan*, 38 F.3d 147, 156 (4th Cir.
1994).   "[T]he fact that both parties simultaneously are arguing that there is no
genuine issue of fact does not establish that a trial is unnecessary [and] thereby
empower[] the court to enter judgment as it sees fit." *Id.* (internal quotation marks
& citation omitted).

## B.    Burden Of Proof And Level Of First Amendment Scrutiny

### 1.    The Government Must Justify A Speech Restriction

When a government enacts a law restricting speech, as the County did here,
it has the burden of showing that the law is consistent with the First Amendment.
*Playboy Entm't Grp., Inc.*, 529 U.S. at 816.  That burden is a "heavy" one, *Org. for
a Better Austin v. Keefe*, 402 U.S. 415, 419 (1971), and cannot  be satisfied by
"mere speculation or conjecture," *Edenfield*, 507 U.S. at 770; *see also Nixon v.*

*Shrink Mo. Gov't PAC*, 528 U.S. 377, 392 (2000) ("We have never accepted mere conjecture as adequate to carry a First Amendment burden."). Rather, the government must offer evidence establishing that the harms it has identified are "real," and that the regulation "alleviate[s] these harms in a direct and material way." *Giovani Carandola, Ltd.*, 303 F.3d at 515 (internal quotation marks omitted).

There are two different types of First Amendment challenges. First, a plaintiff may allege that a law restricting speech is unconstitutional as applied to his own intended expression and so cannot be enforced against him. *See Educ. Media Co. at Va. Tech, Inc. v. Insley,* 731 F.3d 291, 298 (4th Cir. 2013). Second, a plaintiff may attack a law as facially overbroad even if he cannot "demonstrate that his own conduct could not be regulated by a statute drawn with the requisite narrow specificity." *Gooding v. Wilson*, 405 U.S. 518, 521 (1972). To succeed on this type of facial challenge, which is unique to "the First Amendment context," the plaintiff need only show that "a substantial number of [the law's] applications are unconstitutional, judged in relation to the [law's] plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 473 (2010) (quotation marks & citation omitted). Both types of challenges are at issue here, because Reynolds has alleged both that the Ordinance is unconstitutional as applied to his own efforts to solicit contributions from medians throughout the County, and also that the Ordinance is

"overbroad."    JA 124 (asserting that the Ordinance is "overbroad"); JA 127

(asserting that "[Mr.] Reynolds' First Amendment rights were violated").

2.    The Ordinance Is Subject To Intermediate Scrutiny As A
Restriction Of Speech Within Traditional Public Fora

It is undisputed and indisputable that by prohibiting all handbilling,

solicitation, and attempts to sell goods and services from every street and traffic

median within Henrico County, the Ordinance restricts speech within traditional

public fora.  *See Warren v. Fairfax County*, 196 F.3d 186, 194-97 (4th Cir. 1999)

(en banc) (holding that traffic medians, which combine elements of streets,

sidewalks, and parks, are traditional public fora).   "Traditional public forum

property occupies a special position in terms of First Amendment protection,"

*United States v. Grace*, 461 U.S. 171, 180 (1983), and the government's ability to

"'limit expressive activity'" in such locations is accordingly "'sharply

circumscribed,'" *Occupy Columbia v. Haley*, ___ F.3d ___, 2013 WL 6570949, at

*13 (4th Cir. Dec. 16, 2013) (quoting   *Perry Educ. Ass'n v. Perry Local*

*Educators' Ass'n*, 460 U.S. 37, 45 (1983)).

Because the Ordinance limits speech within a public forum, it is subject to at

least intermediate scrutiny.[6]  *See Wag More Dogs, Ltd. Liab. Corp. v. Cozart*, 680

---

[6] Mr. Reynolds argued in District Court that the Ordinance is content-based
because it subjects speech soliciting contributions to distinct regulatory treatment
and because there is evidence that this distinct treatment resulted from the
County's aversion to panhandlers and their message.  *See* JA 9-10,125.  For

18

F.3d 359, 365 (4th Cir. 2012). Under that standard, a law restricting speech will be found unconstitutional unless it is "narrowly tailored to serve a significant governmental interest," and "leave[s] open ample alternative channels for communication of the information." *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984). To be narrowly tailored, a law must not "burden substantially more speech than is necessary to further the government's legitimate interests," though the law need not be the "least restrictive or least intrusive" means of serving those interests. *Ward*, 491 U.S. at 798-99; *see also Am. Legion Post 7 of Durham, N.C. v. City of Durham*, 239 F.3d 601, 610 (4th Cir. 2001) ("A time, place, and manner regulation is not narrowly tailored . . . if a substantial portion of [its] burden on speech does not serve to advance its goals." (internal quotation marks & citation omitted)).

## II. SECTION 22–195 IS NOT NARROWLY TAILORED BECAUSE IT BURDENS SUBSTANTIALLY MORE SPEECH THAN NECESSARY TO SERVE THE COUNTY'S INTEREST IN SAFETY

### A. The Ordinance Restricts A Substantial Amount of Protected Speech

Throughout this litigation, the County has referred to the Ordinance as a "precise[]" and "narrow[]" provision, noting that its restrictions apply only to "highways," which the County has called a "narrowly defined term." JA 52, 170.

---

purposes of this appeal, Mr. Reynolds does not challenge the Ordinance's content-neutrality.

The District Court's acceptance of that description was central to its opinion granting summary judgment to the County. The Court concluded that the Ordinance was narrowly tailored because it "only prohibits activities in the 'highway,' a narrow term including the area reserved for vehicular traffic and the medians," and because it "only prohibits activities that require an interaction between the pedestrian and the motorist or his passenger." JA 179-80. But this characterization of the Ordinance as narrow is belied by the considerable amount of speech that Section 22-195 now proscribes.

The Ordinance restricts handbilling, soliciting contributions, and selling or attempting to sell goods or services from all highways in Henrico County. § 22-195(a). Contrary to the District Court's conclusion, "highway," as defined by the Ordinance, is not "a narrow term." JA 179. Under the Ordinance, "highway" is not limited to the kinds of major expressways that are typically associated with that word, such as Interstate 95 or Interstate 64. Rather, under Section 22-195(b), "highway" encompasses every "road or street" in the County "that is improved, designed, or ordinarily used for vehicular travel," and thus captures quiet back roads, dead-end streets, and cul-de-sacs in addition to major interstate and state highways.

The definition of "highway" also encompasses not only "the entire width of a road or street," but also "the shoulder, the median, and the area between the

travel lane and the back of the curb." § 22-195(b). When combined with the Ordinance's universal application to all roads and streets within the County, the Ordinance prohibits protected speech in wide medians in quiet residential streets as well as in narrow medians at busy intersections. Moreover, following the 2012 amendments to Section 22-195, the Ordinance bars any use of medians by individuals attempting to solicit contributions from motorists or advertise their availability for work, even if they do so through purely passive displays that involve minimal "interaction" between the speaker and vehicle occupants.

Due to its broad scope, the Ordinance prohibits a wide array of protected expression within traditional public fora. In all of Henrico County, individuals are now banned from sitting peacefully at a median near a stop light with a sign saying "Hungry, Homeless, Please Help" or "Will work for food." Boy Scouts cannot stand in a wide median with signs directing drivers to a nearby car-wash fundraiser. Citizens are prohibited from distributing leaflets critical of the local government to drivers of stopped cars at the wide median separating East Parham Road directly in front of the Henrico County Government Center.[7] It is also illegal for people standing on wide medians to collect donations for charities and religious organizations from stopped cars. This includes the median adjacent to Grove

---

[7] The Government Center is located at 4301 E. Parham Road, Richmond, VA 23228. This Court is permitted to take judicial notice of the existence of this wide median. *See* Fed. R. Evid. 201(b)(1), (d).

Avenue Baptist Church,[8] which individuals have historically used as a forum to exercise their First Amendment rights.  JA 87.

In the proceedings below, rather than confront and defend the Ordinance's expansive application, the County focused its narrow-tailoring arguments primarily on what the Ordinance does *not* prohibit, as it pointed out that Section 22-195 does not apply to sidewalks or the sides of the road just past the shoulder.  JA 52-53, 170.  The District Court's opinion followed the same approach.  JA 179-80.  But the possibility that the County could have gone further in restricting speech does not establish that it has not already gone too far, nor does it refute the fact that the ordinance "burden[s] substantially more speech than is necessary to further" a significant government interest.  *Ward*, 491 U.S. at 799; *see also Grace*, 461 U.S. at 180-81 (rejecting the argument that a ban on certain communicative activities on public grounds around the Supreme Court was a reasonable time, place, and manner regulation because it did not extend to streets and sidewalks in the vicinity of the Court or to other public places in Washington, D.C.).  Even assuming sidewalks could provide an acceptable substitute for medians—which is a genuinely disputed fact, *infra* at 49-53—traffic medians are traditional public fora, and as the Supreme Court long ago recognized, "one is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be

---

[8] The church is located at 8701 Bridge Road, Henrico, VA 23229.

exercised in some other place." *Schneider v. New Jersey*, 308 U.S. 147, 151-52 (1939).

**B.** **Courts Have Repeatedly Invalidated Bans On Expression From Medians Absent Particularized Evidence Of Safety Problems**

The District Court's failure to grapple with the Ordinance's real scope led it to incorrectly discount the First Amendment interests at stake in this case. The Court suggested that because the law extended only to the streets "and the medians," it did not impose a substantial burden on expression. JA 179-80.

But as numerous other courts have recognized, bans on expressive conduct covering the use of medians for speech raise significant First Amendment concerns. Indeed, while there are decisions on both sides due to the fact-intensive nature of the inquiry, of the many courts that have considered whether laws restricting access to roadways and/or medians for purposes of speech are constitutional, the majority have either struck the laws down or specifically noted that the laws do not apply to medians. *See, e.g.*, *Comite de Jornaleros de Redondo Beach*, 657 F.3d at 941, 948-51; *Wilkinson v. Utah*, 860 F. Supp. 2d 1284, 1290 (D. Utah 2012); *Traditionalist Am. Knights of Ku Klux Klan v. City of Desloge*, 914 F. Supp. 2d 1041, 1047, 1050 (E.D. Mo. 2012); *News & Sun-Sentinel Co. v. Cox*, 702 F. Supp. 891, 901-02 (S.D. Fla. 1988); *ACORN v. City of New Orleans*, 606 F. Supp. 16, 21-22 (E.D. La. 1984); *cf. ACORN v. St. Louis Cnty.*, 930 F.2d 591, 593-594 (8th Cir. 1991) (parties stipulated that ban on soliciting "in a

roadway" did not apply to medians); *Sun-Sentinel Co. v. City of Hollywood*, 274 F. Supp. 2d 1323, 1332 (S.D. Fla. 2003) (finding that ban on soliciting in roadways left open ample alternative channels because it allowed solicitation from medians); *Dominguez v. State*, 902 S.W.2d 5, 8-9 & n.4 (Tex. Ct. App. 1995) (noting that ordinance banning solicitation in roadways permitted sales from medians, and agreeing that a ban also covering medians would be "overbroad"). *But see Int'l Soc'y for Krishna Consciousness, Inc. v. City of Baton Rouge*, 876 F.2d 494, 498 (5th Cir. 1989); *Thayer v. City of Worcester*, 2013 WL 5780445 (D. Mass. Oct. 24, 2013) (appeal to First Circuit pending, No. 13-2355); *Denver Publ'g Co. v. City of Aurora*, 896 P.2d 306, 316-17 (Colo. 1995).

The line of decisions invalidating governmental restrictions on the use of medians for expressive conduct is consistent with this Court's recognition that medians "quite literally, lie[] at the heart of the Supreme Court's quintessential example of the traditional public forum." *Warren*, 196 F.3d at 196. Indeed, as this Court has noted:

> Consistent with the median strip's function as part of the public thoroughfares traditionally open to the public for expressive activities, people have been engaging in such activity on median strips for as long as median strips have been in existence. Newspaper criers, local civic fundraisers, members of political campaigns, religious groups, and people with a message have often chosen median strips, with their ready access to the bustle of undifferentiated humanity, as their preferred launching point for expressive conduct.

*Id.* at 197.

Moreover, because Section 22-195 applies not just to some streets and medians within the County but to *every* street and median, the County faces a particularly "heavy" burden in showing the law survives First Amendment scrutiny. *Org. for a Better Austin*, 402 U.S. at 419. As other courts have recognized, universal restrictions on expression in and around *all* streets within a geographic area, no matter how varied the speed of traffic or other characteristics of the different roadways, must be supported by evidence that *all* such locations are in fact dangerous for expressive conduct. In *Comite de Jornaleros de Redondo Beach*, for example, the Ninth Circuit held that "evidence of traffic problems" limited to "a small number of major streets and medians" was insufficient to support an anti-solicitation ordinance that "applie[d] citywide to all streets and sidewalks in the City." 657 F.3d at 949. As the court explained, "[b]ecause the burden rests on the City to submit evidence in support of its position," it would be improper to "simply assume that the City's other streets, alleys, and sidewalks allegedly suffer from similar solicitation-related traffic problems." *Id.*

Other courts have applied similar reasoning. In *Traditionalist Am. Knights of Ku Klux Klan*, the court granted a preliminary injunction against an ordinance prohibiting solicitation and leafleting in streets and public ways (which included both medians and sidewalks). Finding that the ordinance was unlikely to satisfy

narrow tailoring, the court observed that the City had "offer[ed] no evidence demonstrating that a complete ban on the use of its streets for expressive activity is justified," and had instead "suggest[ed] only that in the past, solicitation at certain intersections caused traffic congestion." 914 F. Supp. 2d at 1051. Likewise, in *Wilkinson*, the court concluded that a state statute that made it illegal to "sit, stand, or loiter on or near a roadway for the purpose of soliciting from the occupant of a vehicle" violated the First Amendment. 860 F. Supp. 2d at 1286, 1290 (quoting Utah Code Ann. § 41–6a–1009(4)). As the court explained, the statute was not a valid time, place, and manner restriction because "[t]he language of the Statute applie[d] to all roads," and its "prohibition therefore regulate[d] a wide range of situations that likely have no impact on safety." *Id.* at 1290.

Similarly in *News & Sun-Sentinel Co.*, the court found unconstitutional a state statute that made it unlawful for individuals to make any commercial use of the right-of-way of any state road (defined to include medians and sidewalks). The court held that the statute was not narrowly tailored because it "ma[de] no attempt to restrict activity to certain hours, days or nights, or even seasons" and because it "fail[ed] to take into account the fact that actual traffic hazards may vary with the level of traffic flow which exists at each of the state roads." 702 F. Supp. at 901. Finally in *ACORN v. City of New Orleans*, the court invalidated a city ordinance prohibiting persons from standing in a roadway or median for the purpose of

soliciting funds.  Concluding that this restriction on speech was overbroad, the court observed that the ordinance barred solicitation from medians "regardless of the part of town, the number of cars passing, the speed of traffic, the width of the neutral grounds, the presence of a stop sign or traffic signal, or the color of the light."  606 F. Supp. at 22.[9]

As explained further below, this Court should reach the same result as these other courts.  There is absolutely no record evidence that *all* roadways in Henrico County are too dangerous for expressive conduct, and if the County wanted the

_____

[9] While some cases have upheld restrictions on soliciting applicable to roadside medians, their reasoning does not undercut the basic proposition that the government must come forward with evidence to support a geographically expansive "place" restriction on speech.  In some cases, the question of geographic fit did not arise because the plaintiffs directed their challenge to other features of the law at issue.  *See, e.g.*, *Gresham v. Peterson*, 225 F.3d 899, 906 (7th Cir. 2000) (plaintiffs argued that nighttime ban on vocal solicitation was overbroad); *People v. Barton*, 861 N.E. 2d 75, 80- 81 (N.Y. 2006) (plaintiffs argued that law's application to passive solicitation was overbroad); *Denver Publ'g Co.*, 896 P.2d at 315 (newspaper seller plaintiff argued that ordinance should have considered the age of vendors, the time of day of sale, and the prevailing weather conditions).  In another case, the restriction applied to a small area, so the question of fit did not arise.  *See Smith,* 177 F.3d at 955 (anti-panhandling regulation applied to a five-mile strip of beach and two attendant sidewalks).

Notably, in one case where a court did reject a narrow-tailoring argument premised on the law's application to all streets and medians within a broad area, the court did so on the basis of on-point legislative findings and expert testimony adduced at a hearing.  *See Int'l Soc'y for Krishna Consciousness of New Orleans*, 876 F.2d at 498 ("The city traffic engineer testified that while solicitations are most hazardous during peak hours on major routes, solicitations on other routes carry other hazards, e.g., no sidewalks, narrow shoulders, open drainage ditches, etc.").  No expert testimony has been offered by the County in this case, nor are there any relevant legislative findings.  *See infra* at 31.

Court to credit that proposition—which flies in the face of common sense—it was the County's burden to come forward with evidence supporting an expansive ban applicable to all roadways and medians. Yet the County came forward with nothing more than Chief Middleton's speculative and unsupported opinion, which did not even purport to address safety risks on roadways and medians throughout the County. *See infra* at 37-38. That is an insufficient evidentiary basis to support a ban on speech applicable to all roadways, particularly at the summary judgment stage.

### C. The County's Evidence Is Inadequate To Meet Its Burden

#### 1. Chief Middleton's Subjective Assessment Of Risk Is Inadequate To Support The Ordinance's Speech Restrictions

Intermediate scrutiny under the First Amendment "requires the government to produce evidence that a challenged regulation materially advances an important or substantial interest by redressing past harms or preventing future ones." *Giovani Carandola, Ltd*., 303 F.3d at 515 (internal quotation marks & citation omitted). "[D]epending on the scope and context of the restriction in question," the government "does not always need to produce a panoply of 'empirical studies, testimony, police records, [or] reported injuries'" to satisfy this standard. *Horina v. City of Granite City*, 538 F.3d 624, 633 (7th Cir. 2008). But it must do better than speculate about possible risks or "blindly invoke safety and congestion considerations without more," because "[u]sing a speech restrictive blanket with

28

little or no factual justification flies in the face of preserving one of our most cherished rights." *Weinberg v. City of Chicago*, 310 F.3d 1029, 1038-39 (7th Cir. 2002). Rather, the government must come forward with "objective evidence" showing that a regulation of speech advances a significant government interest. *Id.*; *see also Legend Night Club v. Miller*, 637 F.3d 291, 298 (4th Cir. 2011) (noting that the government failed to "present any studies relied upon by the Maryland General Assembly to establish the secondary effects supposedly targeted by the amendment," while concluding that a law restricting adult entertainment clubs violated the First Amendment).

The District Court concluded that the Ordinance furthers a legitimate government interest in public safety. JA 179. In support of that determination, the District Court did not cite any record evidence of safety issues involving Henrico County's streets and medians (and there was none). Instead, the Court relied on a case citation for the proposition that "cities have a legitimate interest in protecting their citizens and ensuring that their streets and sidewalks are safe." *Id.* (quoting *Cox v. City of Charleston*, 250 F. Supp. 2d 582, 589 (D.S.C. 2003)).

In approaching the issue in this way, the District Court proceeded at far too high a level of generality. *See Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 664 (1994) (plurality opinion) ("That the Government's asserted interests are important in the abstract does not mean . . . that the [rules adopted] will in fact

advance those interests."). No one doubts that the County has an interest in keeping its streets safe or that it may pass traffic laws. Mr. Reynolds does not question, for example, the County's authority to regulate jaywalking or related conduct that directly obstructs traffic flow. *See infra* at 45-46.

But that *some* time, place, and manner restrictions in and around public streets may be justified by reference to public safety concerns sheds little light on the question whether the *particular* restrictions imposed by Section 22-195 "materially advance[]" public safety. *Giovani Carandola, Ltd.*, 303 F.3d at 515 (internal quotation marks & citation omitted); *see also Kuba v. 1-A Agric. Ass'n*, 387 F.3d 850, 859 (9th Cir. 2004) (recognizing that pedestrian and traffic safety are significant government interests, but explaining that "merely invoking interests in regulating traffic . . . is insufficient" because "[t]he government must also show that the proposed communicative activity endangers those interests"); *Weinberg*, 310 F.3d at 1040 ("We do not find that the City has no substantial interest in maintaining safety around the United Center. We do, however, find that the City has not appropriately demonstrated that Weinberg or any other peddler creates the problems the City asserts they cause."); *John Donnelly & Sons v. Campbell*, 639 F.2d 6, 8 (1st Cir. 1980) (explaining that in reviewing time, place, and manner restrictions, courts must "evaluate not only the importance of the state's interests, but also the extent to which the restrictions further those interests"). And on that

30

critical question, the evidence and legal arguments put forward by the County in the District Court fall short, particularly on the County's own motion for summary judgment.

As an initial matter, Section 25-195 itself does not include any findings from the Board of Supervisors concerning the safety concerns the Ordinance was designed to address. Nor does the summary judgment record contain any evidence of legislative findings about whether, when, and where it is dangerous to distribute handbills, solicit contributions, or sell merchandise or services from roads and medians in the County. By contrast, the record does show a complete absence of any objective basis for the County's action: the County neither conducted a study nor consulted a traffic safety expert before enacting the Ordinance. JA 118.

Lacking any legislative findings, empirical studies, or other reports to support the Ordinance, the County has instead relied entirely on the judgment of one police officer, Chief Middleton, who was the law's principal advocate. But when Chief Middleton's submission is scrutinized, as the First Amendment requires, it becomes clear that Chief Middleton's judgment was based largely on conjecture, rather than objective evidence. It accordingly does not provide an adequate basis for the County to demonstrate that the Ordinance substantially furthers a significant interest in public safety. *See Weinberg*, 310 F.3d at 1039 (finding that a peddling restriction within 1,000 feet of the United Center in

Chicago was not a valid time, place, and manner regulation because the city "ha[d] provided no objective evidence that traffic flow on the sidewalk or street is disrupted when Mr. Weinberg sells his book").

Chief Middleton has acknowledged that he is "not a traffic safety specialist," and that he did not consult with any experts in traffic or pedestrian safety before recommending the Ordinance to the Board of Supervisors. JA 103, 117-18. He has also conceded that the police department had not received "any specific complaints about people getting injured while they're sitting in the median strip." JA 113. Rather, as explained in his affidavit, Chief Middleton concluded that the presence of individuals on medians engaged in handbilling, soliciting, and peddling posed an unacceptable risk based on his own "opinion." JA 60.

To be sure, Chief Middleton noted that his opinion was informed by his "own personal observations, the credible reports of other law-enforcement officers and citizens, and [his] experience as a law-enforcement officer." *Id.* But though Chief Middleton couched his judgment in terms of quasi-empirical observations, review of Chief Middleton's presentation to the Board of Supervisors and his deposition testimony in this case makes clear that he based his safety assessment on little more than intuition.

To begin with, Chief Middleton indicated in his presentation to the Board of Supervisors that there had been "an increase" in recent years in the number of

32

individuals using the medians for handbilling, soliciting, and peddling. JA 63-64. Evidence of an increase in individuals using medians for expressive conduct, however, is not grounds for banning speech; free speech is not a weed, to be plucked if it grows too high. If anything, the fact that the County had seen an "increase" in the use of the medians for expression, but did not identify any correlative increase in accidents or near-misses caused by individuals on medians—or indeed, provide any evidence of accidents or near-misses at all—casts doubt on the County's asserted public-safety interest.

Chief Middleton did state to the Board of Supervisors that use of the medians for expression had "generated a significant increase in complaints from citizens," *id.,* though he later acknowledged that he "never sat down and calculated" the specific numbers. JA 100. But Chief Middleton has subsequently clarified that although he took "the community's concerns into consideration," he did not rely on the complaints as the basis for his recommendation to amend the Ordinance. JA 100-01.

And for good reason. As a general matter, scattered anecdotal reports of claimed harms from unidentified individuals provide an insufficient basis for restricting protected expression. *See New Albany DVD, LLC v. City of New Albany*, 581 F.3d 556, 559-61 (7th Cir. 2009) (reversing grant of summary judgment where a municipality passed regulations of adult bookstores based upon

"some anecdotal" testimony by people complaining that theft and pornographic litter was more prevalent around those stores). Subjective complaints, which are just as likely (if not more so) to be complaints about the *speaker* or the *speech*, rather than about *safety* concerns, cannot substitute for "objective evidence." *Weinberg*, 310 F.3d at 1039. That is particularly true here because panhandlers tend not to be particularly popular speakers. Accordingly, it is unsurprising that some citizens' objections to their presence on medians had little to do with safety, and instead consisted of complaints that panhandlers "are not willing to even try to support themselves," JA 83, as well as suggestions that County officials restrict median access to panhandlers in order to "'reduc[e] their take for the day, which might be an inducement to stop panhandling,'" JA 35.

Moreover, even when citizen complaints did reference safety concerns, the ones that the County has identified provide no basis for the Ordinance's speech proscriptions. The only reports whose content Chief Middleton has described in any detail were reports of individuals sitting on medians with pets or children.[10] Chief Middleton's focus on these examples is curious, because they bear no relation to the Ordinance. After all, even after the amendments to Section 22-195, it remains permissible under the Ordinance for an individual to sit or stand on a median with an unlimited number of children *and* dogs provided he refrains from

---

[10] The record is not clear as to whether these reports were made by citizens, other police officers, or both groups. JA 102-03.

engaging in the restricted expressive activities.  Thus, if keeping children and pets off medians and out of the streets is a significant safety concern for the County, the Ordinance does nothing to further it.

Removing these citizen complaints from the equation leaves the County with no evidence to back Chief Middleton's assertions about traffic safety and medians other than his own assessments and the reports from unidentified police officers who work for him, which were in turn based on their largely unspecified observations.  These subjective assessments of risk are inadequate to satisfy the County's burden, particularly on summary judgment.  The fact that some law enforcement officers may genuinely believe that medians are too dangerous for certain expressive activities—including speakers sitting within large medians and passively displaying signs—is no substitute for actual evidence of danger. *See  Edenfield*, 507 U.S. at 770 (recognizing that a First Amendment burden "is not satisfied by mere speculation or conjecture").[11]  First Amendment freedoms, after all, would surely lack "the breathing space [they] need[] . . . to survive," *City of Houston v. Hill*, 482 U.S. 451, 467 (1987) (internal quotation marks & citation

---

[11] *Edenfield* involved an application of intermediate scrutiny in the context of a commercial speech restriction under the test from *Central Hudson Gas & Electric Corp. v. Public Service Commission of New York*, 447 U.S. 557 (1980), which "[is] substantially similar to the application of the test for validity of time, place, and manner restrictions upon protected speech," *Board of Trustees of State University of New York v. Fox*, 492 U.S. 469, 477 (1989) (internal quotation marks omitted).

omitted), if they could be subverted by police officers' well-meaning, but unsupported, predictions about safety.

Where the government fails to offer any evidence that its restriction on speech is needed to actually serve its asserted interest, courts, including this one, have not hesitated to strike those restrictions down.  *See, e.g.*, *Giovani Carandola, Ltd.*,, 303 F.3d at 517; *Horina*, 538 F.3d at 634; *Kuba*, 387 F.3d at 858-61; *Weinberg*, 310 F.3d at 1039; *Krantz v. City of Fort Smith*, 160 F.3d  1214, 1221-22 (8th Cir. 1998).  The Court should follow that course here.

> 2.    The County Has Failed To Justify The Ordinance's County-Wide Scope

Even if the Ordinance's speech restrictions arguably further an interest in public safety as applied to certain busy streets and medians—despite the lack of objective evidence introduced by the County to establish that point—the law's unqualified application to every street and median within the County is substantially overinclusive.  Because the District Court accepted the County's mischaracterization of "highway" as a "narrow term," JA 179, it never demanded evidence from the County to justify the full breadth of the Ordinance's prohibition.  This was error.  Section 22-195's geographic over-inclusiveness alone means that the Ordinance is not narrowly tailored to achieve the County's interest in safety, and thus requires reversal of the District Court's decision.  *See supra* at 25-27.

Far from demonstrating the existence of a countywide problem that could support a countywide restriction on speech, the record suggests that the County's purported safety concerns were connected to particular medians at particular locations. For example, a report prepared by the County Attorney in support of the 2012 amendment to the Ordinance that was distributed at the public hearing before the Board of Supervisors noted an "increased presence" of individuals in "County highways, *especially in the medians of numerous intersections in the West End of the County*." JA 29 (emphasis added). Similarly, in describing the specific safety concerns that led him to recommend amending the ordinance, Chief Middleton asserted that "any time you have individuals in an intersection, *particularly busy intersections*, . . . there's a public safety concern." JA 101 (emphasis added). He added that "with traffic as busy as it is in many of these intersections, and the volume that was there," he was concerned for the safety of both solicitors and drivers. JA 102; *see also* JA 106 (Chief Middleton's testimony that he thought the dangers from people occupying medians "were pretty significant, particularly in some of the larger intersections where people were standing or sitting").

Of course, not every street and median within Henrico County is located at a busy intersection with heavy traffic volume. *See* JA 156 (describing medians outside of the "major road[s]" in places like "subdivision roads" where medians are used for "tree plantings" and "light poles"). Yet given Section 22-195(b)'s

37

expansive definition of "highway," the Ordinance treats every roadway and every median within the County as if it were on U.S. Route 250 (known in Henrico County as West Broad Street).  *See* JA 132 (listing top automobile accident locations for 2012, many of which were on West Broad Street).  Moreover, the Ordinance does not distinguish between medians along other dimensions that are relevant to safety, such as the median's width or whether it is located next to a traffic light or a stop sign.

In short, the County has adopted a "one-size-fits-all approach" to regulating expression on its streets and medians, which "cannot be reconciled with our First Amendment rights."  *Weinberg*, 310 F.3d at 1040 (citing *Cox v. Louisiana*, 379 U.S. 559 (1965)).  As a result, the Ordinance's scope goes well beyond  the "exact source of the 'evil' [the law] seeks to remedy," and is not narrowly tailored. *Frisby v. Shultz*, 487 U.S. 474, 485 (1988).

At the very least, the District Court should not have granted summary judgment to the County on this record.   As this Court has recognized, deciding whether a time, place, and manner restriction on speech is narrowly tailored "requires careful consideration of highly particularized facts, such as the . . . traffic patterns at various times and places around town."  *Davenport v. City of Alexandria*, 710 F.2d 148, 151-52 (4th Cir. 1983) (concluding that the court lacked sufficient information about Old Town Alexandria to determine whether a law

prohibiting performances and exhibitions on sidewalks and walkways in the central business district was narrowly tailored, and remanding for further factual development); *see also Hickory Fire Fighters Ass'n v. City of Hickory*, 656 F.2d 917, 923-24 (4th Cir. 1981) (reversing grant of summary judgment to the city where the court found the record was inadequate to determine whether a law imposing conditions on peaceful picketing was narrowly tailored).[12]    No such "careful consideration" was conducted by the District Court here, and the present record is inadequate to sustain the County's burden in defending the Ordinance's countywide restriction on expressive conduct.

### D.    The Ordinance's Underinclusiveness Further Undermines the County's Asserted Safety Justification

In addition to going too far by restricting expressive conduct in places where there are no meaningful safety problems, the Ordinance also fails First Amendment scrutiny because it is not remotely tailored to the problem it purports to address: the Ordinance restricts certain expressive conduct like soliciting, which just-so-happens to be associated with unpopular speakers like Mr. Reynolds, while leaving

---

[12] In both of these cases, the court indicated that the narrow-tailoring inquiry required the government to show that it had adopted the least-restrictive alternative to further its interest.  *See Davenport*, 710 F.2d at 152; *Hickory Fire Fighters Ass'n*, 656 F.2d at 924.  The Supreme Court subsequently clarified that this standard does not apply to content-neutral time, place, and manner regulations. *See Ward*, 491 U.S. at 798.  The disposition in *Davenport* and *Hickory Fire Fighters* did not turn, however, on the particular fit required between end and means, but rather on the antecedent question of what evidence is required for a court to conduct a proper tailoring inquiry.

unregulated speech that can be expected to have the same impact on traffic safety (if there is one).

"The Supreme Court has repeatedly recognized that an underinclusive regulatory scheme is not narrowly tailored." *Joelner v. Vill. of Washington Park*, 508 F.3d 427, 433 (7th Cir. 2007). That is because when a law restricts the expression of some speakers while exempting the speech of others who are similarly situated, it "raises serious doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint." *Brown v. Entm't Merchs. Ass'n*, 131 S. Ct. 2729, 2740 (2011). Even in the context of intermediate scrutiny, numerous courts have held that underinclusive laws fail narrow-tailoring review. *See, e.g.*, *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 425 (1993) (where "[t]he city has asserted an interest in esthetics, but respondent publishers' newsracks are no greater an eyesore than the newsracks permitted to remain on [the city's] sidewalks," the ordinance was unconstitutional); *Saieg v. City of Dearborn*, 641 F.3d 727, 737-38 (6th Cir. 2011) (striking down prohibition on leaflet distribution where sidewalk vendors were not restricted); *Berger v. City of Seattle*, 569 F.3d 1029, 1043 (9th Cir. 2009) (holding that permitting and badge requirements for street performers were not narrowly tailored to an interest in protecting safety and convenience of park-goers where the requirements did not apply to gatherings of large groups for

expression, "so long as they are not engaged in an artistic performance"); *Joelner*, 508 F.3d at 433 (finding that an ordinance banning the sale of alcohol in newly licensed adult establishments failed intermediate scrutiny where existing establishments were exempted); *News & Sun-Sentinel Co.*, 702 F. Supp. at 902 (statute was unconstitutional where it only prohibited "commercial" activity on roads, such that the sale of newspapers would be barred but not the free distribution of newspapers on the same street); *People v. Griswold*, 821 N.Y.S.2d 394, 402-03 (N.Y. City Ct. 2006) (finding panhandling ordinance unconstitutional where it prohibited the plaintiff from soliciting on the sidewalk ostensibly to prevent traffic disruption, but the city did not ban other similar solicitation activities like signs advertising newspaper sales)

Here, even if the Court accepted Chief Middleton's claims about the dangers presented by individuals using medians, those claims do little to justify the particular restrictions imposed by the Ordinance. Though Chief Middleton indicated that his "focus[] [was] on the flow of traffic, the amount of traffic accidents, and the conflicts that can be created between [drivers] and pedestrians," he acknowledged that individuals who remain on medians for expressive activities, particularly those sitting in medians, do not pose a risk of stepping into and obstructing traffic. JA 103, 106. He claimed that such individuals still created significant safety risks, because their presence on medians could distract drivers

and because a distracted driver might run up onto a median and strike a pedestrian. JA 101, 105-06, 108. But in addition to the absence of any record evidence of accidents that were caused this way, Chief Middleton's conjecture about distraction does not explain why the expressive activities of various solicitors and peddlers are meaningfully different from numerous other examples of speech that the County leaves unrestricted.

For example, the County allows commercial signs to be displayed along public streets and on vehicles themselves even though such signs are designed to attract a driver's attention temporarily away from the road. JA 112-13. Indeed, the County has previously allowed the display of the kind of large, flashing billboards designed to attract a level of driver attention that a humble speaker standing or sitting on a median could not possibly match. *See* Emily C. Dooley, *Chesterfield man the face of eSmartTax.com*, Richmond Times Dispatch, Jan. 21, 2010, available at http://www.timesdispatch.com/business/chesterfield-man-the-face-of-esmarttax-com/article_065acb33-4ced-5243-8900-caa7e9c54738.html (describing a 14-by-36 foot digital billboard that displayed a customer's face and Twitter posts).

Likewise, under the Ordinance, individuals may stand on medians and hold out signs for passing cars to view that promote a political candidate, argue against United States' military intervention abroad, or advocate for impeaching the

President. Such signs presumably create the same risk of distraction—to the extent one exists—as an individual standing or sitting on a median with a "Hungry, Homeless, Please Help" or a "Will work for food" sign.

The County's decision to leave such expression unregulated, despite its similar effects to the expressive conduct the Ordinance proscribes, undercuts its claim that Section 22-195 substantially furthers a government interest in reducing driver distraction.

### E.    The County Had Available Numerous Less Speech-Restrictive Alternatives To The Ordinance

In addition to the lack of fit between the Ordinance's scope and any demonstrated safety concerns, Section 22-195 also fails narrow-tailoring review because the County "has a number of less restrictive means of achieving its stated goals." *Comite de Jornaleros de Redondo Beach*, 657 F.3d at 949. While a regulation "need not be the least speech-restrictive means of advancing the Government's interests," to satisfy narrow tailoring, whether a government could have achieved its objectives in ways less restrictive of protected speech is critical to the ultimate question whether a law "burden[s] substantially more speech than is necessary to further the government's legitimate interests." *Maryland v. Universal Elections, Inc.*, 729 F.3d 370, 376 (4th Cir. 2013) (internal quotation marks & citation omitted); *see also Comite de Jornaleros de Redondo Beach*, 657 F.3d at 950 ("Even under the intermediate scrutiny 'time, place, and manner' analysis, we

43

cannot ignore the existence of . . . readily available alternatives."); *Casey v. City of Newport*, 308 F.3d 106, 113-14 (1st Cir. 2002) ("[T]he narrow-tailoring test requires the district court to consider whether the regulation challenged on First Amendment grounds sweeps more broadly than necessary to promote the government's interest. That consideration, in turn, cannot be done without some evaluation of the alternative measures put in issue by the parties.").

1.    The County Could Achieve Its Safety Objectives By Enforcing Existing Laws Regulating Traffic Obstruction

One alternative that courts consider is whether the government could have achieved its stated objective by enforcing existing laws. If so, then the enactment of a new law imposing additional burdens on speech will generally not qualify as narrowly tailored. *See, e.g.*, *Comite de Jornaleros de Redondo Beach*, 657 F.3d at 949 ("The City has various other laws at its disposal that would allow it to achieve its stated interests while burdening little or no speech."); *Horina*, 538 F.3d at 635 (concluding that because the city "already proscribes in some form litter, intrusion, trespass, or harassment," it could "combat those problems very effectively without resorting to a broad prohibition on handbilling"); *Casey*, 308 F.3d at 115-16 ("[I]f enforcing the noise ordinance would effectively achieve the City's noise-reduction objective, and the burden on speech imposed by the no-amplification restriction is substantially broader than the burden that would be imposed by enforcing the noise ordinance, the no-amplification restriction may not meet the narrow tailoring

44

test.").   Here, there were other laws that the County could have turned to that would have allowed the County to protect motorists and pedestrians without substantially burdening speech.

For example, to address concerns about panhandlers on medians impeding traffic by "step[ping] out in front of a car" or otherwise "causing [cars] to stop," as Chief Middleton indicated was a problem in his deposition testimony, JA 101, 105, the County could have simply enforced laws regulating jaywalking and traffic obstruction.  A Henrico County ordinance makes it unlawful "to loiter at, on or in a public place or place open to the public" when doing so will "unreasonably hinder, impede or obstruct the free passage of pedestrians or vehicles."  Henrico County Code §13-22(c)(1).[13] Virginia state law in turn prohibits pedestrians, "[w]hen crossing highways,"[14] from "carelessly or maliciously interfer[ing] with the orderly passage of vehicles," and it further directs pedestrians to cross highways, "whenever possible, only at intersections or marked crosswalks."   Va. Code Ann. § 46.2-923.   Another state law makes it illegal for a pedestrian to "step into a

_____

[13] To the extent this ordinance does not apply to conduct like leafleting, soliciting, or peddling because those expressive activities do not qualify as "loitering," *see Lytle v. Doyle*, 326 F.3d 463, 469 (4th Cir. 2003), the County could have amended the ordinance's "loitering" element while retaining the law's focus on traffic obstruction.

[14] State law defines "highway" to mean, as relevant, "the entire width between the boundary lines of every way or place open to the use of the public for purposes of vehicular travel in the Commonwealth, including the streets and alleys."  Va. Code Ann. § 46.2-100.

highway open to moving vehicular traffic at any point between intersections where his presence would be obscured from the vision of drivers of approaching vehicles by a vehicle or other obstruction at the curb or side."  Va. Code Ann. § 46.2-926. Together, these laws provide Henrico County law-enforcement officers with ample tools to handle any safety problems caused by individuals on medians who wonder out into moving traffic and create hazards for drivers.

Without ever expressly addressing the relevance of existing laws like these, the County has implicitly defended Section 22-195's broad prophylactic approach to traffic safety on the ground that it enables police officers to "act[] proactively, and not reactively to prevent a tragedy."  JA 45 (County's summary judgment memorandum citing Chief Middleton's testimony before the Board of Supervisors).  In other words, the County appears to have decided that it is appropriate to preemptively bar handbillers, solicitors, and peddlers from all streets and medians based on a concern that some subset of these individuals will cause problems, and that enforcing existing laws against jaywalking, obstructing traffic, and the like, if and when they have been broken, would be too "reactive."

When First Amendment liberties are at stake, however, the use of "'[b]road prophylactic rules . . . [is] suspect." *Vill. of Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620, 637 (1980) (quoting *NAACP v. Button*, 371 U.S. 415, 438 (1963)).  Governments are expected to enforce laws that directly address their

concerns, rather than restrict speech as a convenient shortcut to achieving a concededly legitimate end. *See id.* ("The Village's legitimate interest in preventing fraud can be better served by measures less intrusive than a direct prohibition on solicitation. Fraudulent misrepresentations can be prohibited and the penal laws used to punish such conduct directly."); *Schneider*, 308 U.S. at 162 (holding that if a city seeks to prevent littering, it should punish "those who actually throw papers on the street" rather than categorically prohibit protected speech in a public fora). Under that reasoning, the County should be required to address traffic-safety concerns by enforcing laws that directly address traffic obstruction and other problematic behavior, rather than by attempting to take away the opportunity for obstruction by restricting broad categories of speech for all individuals, including those who merely sit on medians and passively seek charity or employment.

2.    The County Failed To Even Consider Other Less Restrictive Alternatives To The Ordinance

In addition to enforcing existing laws, numerous other less burdensome alternatives were available to the County. For instance, to the extent the County identified a problem with individuals bringing pets and children onto medians—as Chief Middleton stressed in his presentation to the Board of Governors, *supra* at 5,

one obvious solution would have been to bar pets and young children from medians. Yet no such measure was considered.[15]

At the very least, the County could have adopted a narrower law that applied only to streets and medians where the restricted expressive activities were most likely to generate safety problems. A Virginia statute provides an instructive example in this regard. Under Va. Code Ann. § 46.2-930, it is unlawful for pedestrians to "loiter on any bridge or in any portion of the right-of-way of any highway where loitering has been determined by the Commissioner of Highways or the local governing body of any county, city, or town to present a public safety hazard and on which the Commissioner of Highways or the governing body of any county, city, or town has posted signs prohibiting such action." Thus, in contrast to Section 22-195's blunt approach, this state statute builds geographic tailoring into the law's scope by limiting access only to bridges and portions of highway right-of-ways that the government has specifically identified as dangerous.[16]

---

[15] The danger created by individuals bringing children or pets onto medians might also have been addressed by enforcing existing law, at least in some circumstances. *See* Va. Code Ann. § 18.2-371.1(B) (prohibiting "abuse and neglect of children" based on a willful act or omission showing "a reckless disregard for human life"); Henrico County Code § 5-29(6) (prohibiting "dogs running at large," which is defined to include a dog "roaming . . . off the property of its owner or custodian and not under its owner's or custodian's immediate control").

[16] This Court found a previous version of Va. Code Ann. § 46.2-930 unconstitutional as applied to political protestors on vagueness grounds, because the protestors lacked reasonable notice that the statute's prohibition on loitering

It is, of course, not a court's job to micromanage legislative decisionmaking, and governments generally have wide latitude in selecting their preferred means to further legitimate objectives. *See Armour v. City of Indianapolis*, 132 S. Ct. 2073, 2080 (2012). But when First Amendment rights are at issue, governments may not turn to speech restrictions as their "first resort" to address a problem. *See Thompson v. W. States Med. Ctr.*, 535 U.S. 357, 373 (2002) ("If the First Amendment means anything, it means that regulating speech must be a last—not first—resort."). Here, the County's failure to attempt or even consider less speech-restrictive strategies to address public-safety concerns undermines the Ordinance's claim to narrow tailoring.

## III. SECTION 22–195 DOES NOT LEAVE OPEN ADEQUATE ALTERNATIVE CHANNELS FOR SPEECH

Even apart from the lack of evidence to support the Ordinance's speech restrictions and its insufficient tailoring, Section 22-195 would not survive First Amendment scrutiny because the County has not met its burden of showing that the Ordinance leaves open ample alternative channels for communication. Though the First Amendment does not always guarantee a speaker the right to her "first or best choice" of locations, *Gresham v. Peterson*, 225 F.3d 899, 906 (7th Cir. 2000), a law that fails to leave speakers with "realistic[]" opportunities for effective

---

applied to them. *See Lytle*, 326 F.3d at 469. The court held that the statute was not facially invalid, however, because "restricting activity on *particular bridges* to protect safety concerns might be constitutional." *Id.* at 471 (emphasis added).

speech does not provide adequate alternatives.  *Linmark Assocs.*, 431 U.S. at 93. In particular, if proposed alternatives "are less likely to reach persons not deliberately seeking" the protected speech, and "may be less effective media for communicating the message" they will not qualify as adequate.  *Id.*  Moreover, "an alternative is not adequate if it foreclose[s] a speaker's ability to reach one audience even if it allows the speaker to reach other groups." *Weinberg*, 310 F.3d at 1041 (internal quotation marks & citation omitted); s*ee also City of Ladue v. Gilleo*, 512 U.S. 43, 57 (1994) (overturning an ordinance that barred residents from posting any type of sign on their property in part because "a person who puts up a sign at her residence often intends to reach *neighbors*, an audience that could not be reached nearly as well by other means" (emphasis in original)).

The District Court concluded that the Ordinance leaves adequate alternative channels of communication open because individuals may still distribute handbills, solicit contributions, and sell goods and services on sidewalks and along the side of the street.  JA 180.  But as this Court has recognized, medians—which are isolated from other pedestrians, parked cars, and other obstacles that limit visibility, and which can be seen by vehicles in two-way traffic—offer unique benefits to speakers seeking to disseminate their views, given their "ready access to the bustle of undifferentiated humanity."  *Warren*, 196 F.3d at 197.

50

Consistent with this understanding, Mr. Reynolds has explained that displacing solicitors and other speakers from every median in the County and thus forcing them to use the sidewalks (where they exist) compromises the ability of solicitors to reach their target audience: drivers.  JA 9.[17]  Without the ability to stand or sit in the median that is located where traffic slows down or stops (because of a traffic light or stop sign), solicitors like Mr. Reynolds cannot reach drivers with their message in time for it do any good.  *Id.*  Moreover, even if a driver does see a solicitor in time to understand the message and act upon it, it will often be too difficult for her to make a charitable contribution because she cannot reach across the passenger seat and extend money to a solicitor unless the solicitor violates the Ordinance and enters the roadway.  *Id.*[18]

The "First Amendment protects the right of every citizen to reach the minds of willing listeners and to do so there must be opportunity to win their attention." *Hill v. Colorado*, 530 U.S. 703, 728 (2000) (internal quotations and citations omitted).  It also "'mandates that [courts] presume that speakers, not the government, know best what they want to say and how to say it.'"  *Weinberg*, 310

---

[17] The County has not suggested that solicitors for personal charity like Mr. Reynolds have other adequate alternatives available besides soliciting on sidewalks and along the side of the road beyond the shoulder.  *See* JA 52-53.

[18] Notably, other courts have stressed the importance of maintaining medians as a forum where individuals can solicit in upholding solicitation restrictions that did not apply to medians as providing adequate alternatives.  *See, e.g.*, *Sun-Sentinel Co.*, 274 F. Supp. 2d at 1332; *Dominguez*, 902 S.W.2d at 8-9 & n.4.

F.3d at 1041 (quoting *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 790-91 (1988)).  And where, as here, the speech rights of individuals with meager resources are at issue, courts should be particularly hesitant to accept laws that take away the only means of expression that has previously proven effective. *See Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Vill. of Stratton,* 536 U.S. 150, 163 (2002) (finding permit requirement for door-to-door canvassing facially invalid in case brought by Jehovah's Witnesses group, and noting that they were "not the only 'little people' who face the risk of silencing" from such regulations); *Martin v. City of Struthers*, 319 U.S. 141, 146 (1943) (striking down a restriction on door-to-door leafleting while observing that such a manner of expression "is essential to the poorly financed causes of little people").  The County thus does not honor the constitutional right to engage in solicitation by letting individuals panhandle only where doing so will have no realistic possibility of success. *Cf. Comite de Jornaleros de Redondo Beach*, 657 F.3d at 948-51 (Gould, J. concurring) (concluding that an ordinance effectively barring day laborers from congregating in the city failed to provide adequate alternatives because it left laborers "without any practical way to reach their intended audience with a message of job solicitation").

    In light of Section 22-195's application to *all* medians and public roads in Henrico County, and the importance of medians to effective solicitation, the

Ordinance does not leave open "*ample* alternative channels" for panhandlers like Reynolds to communicate their message. *Ward*, 491 U.S. at 791 (emphasis added). Particularly on a motion for summary judgment, the District Court should not have concluded that soliciting from sidewalks is sufficient for Mr. Reynolds to reach his intended audience of the thousands of motorists who drive through Henrico County on a daily basis. For this reason as well, the District Court's decision granting summary judgment to the County should be reversed.

## <u>CONCLUSION</u>

For the foregoing reasons, this judgment of the District Court should be reversed. This Court should direct the District Court to enter summary judgment for Mr. Reynolds with respect to his claim that Henrico County Ordinance § 22-195 is invalid under the First Amendment, or in the alternative, this Court should direct the District Court to allow further factual development.

Respectfully submitted,

     s/ William M. Jay

William M. Jay
Brian T. Burgess
GOODWIN PROCTER LLP
901 New York Avenue NW
Washington, DC 20001
Telephone: (202) 346-4000
Facsimile: (202) 346-4444
wjay@goodwinprocter.com
bburgess@goodwinprocter.com

Kevin P. Martin
GOODWIN PROCTER LLP
Exchange Place
Boston, MA 02109
Telephone:  (617) 570-1000
Facsimile:  (617) 523-1231
kmartin@goodwinprocter.com

*Attorneys for Appellant Robert S. Reynolds*

Dated: January 14, 2014

## <u>REQUEST FOR ORAL ARGUMENT</u>

Pursuant to FED. R. APP. P. 34(a) and Local Rule 34(a), Reynolds respectfully requests oral argument in this appeal. This appeal raises important questions concerning the scope of protection provided by the First Amendment to the United States Constitution to speakers within a traditional public forum that have not previously been decided by this Court. Oral argument will accordingly assist the Court in addressing the issues raised in this appeal.

# UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

No. 13-2389          **Caption:** Robert S. Reynolds v. Douglas A. Middleton

## CERTIFICATE OF COMPLIANCE WITH RULE 28.1(e) or 32(a)
Type-Volume Limitation, Typeface Requirements, and Type Style Requirements

1. **Type-Volume Limitation:** Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 14,000 words or 1,300 lines. Appellee's Opening/Response Brief may not exceed 16,500 words or 1,500 lines. Any Reply or Amicus Brief may not exceed 7,000 words or 650 lines. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include footnotes in the count. Line count is used only with monospaced type.

   This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

   [✓] this brief contains ____13,041____ [*state number of*] words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

   [ ] this brief uses a monospaced typeface and contains _____ [*state number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. **Typeface and Type Style Requirements:** A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger. A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch).

   This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

   [✓] this brief has been prepared in a proportionally spaced typeface using
   Microsoft Word 2010 _____ [*identify word processing program*] in
   14-point Times New Roman _____ [*identify font size and type style*]; **or**

   [ ] this brief has been prepared in a monospaced typeface using
   _____ [*identify word processing program*] in
   _____ [*identify font size and type style*].

(s) s/ William M. Jay _____

Attorney for Appellant Robert S. Reynolds _____

Dated: January 14, 2014 _____

# CERTIFICATE OF SERVICE

I certify that on <u>January 14, 2014</u>  the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

Andrew Ramsey Newby
OFFICE OF THE COUNTY ATTORNEY
County of Henrico
P. O. Box 90775
Henrico, VA 23273-0775
Phone: 804-501-4676
Email: new23@co.henrico.va.us

s/ William M. Jay
_____
Signature

January 14, 2014
_____
Date